**Leon WASHINGTON, suing on his behalf and as Personal Representative of the Estate of Hardy James, Jr., Plaintiff,**

v.

**Dean STARKE; Ronald Kienzle; Michael Krugh; Keith Diamond; Thomas Yops; Maurice Crandell; Dale Easton; Benton Township; the City of Benton Harbor; Berrien County; Jack Drach; Forrest (Nick) Jewell; and Sam Watson, Defendants.**

No. K 85–252.

United States District Court,
W.D. Michigan, S.D.

Jan. 24, 1986.

James Gould, Grand Rapids, Mich., for plaintiff.

Stephen Small, Benton Harbor, Mich., for Benton Tp., Drach, Kienzle, Diamond & Krugh.

Timothy Downs, Detroit, Mich., for Benton Harbor Police Dept., Starke, Easton, Watson and City of Benton Harbor.

Stanley Stek, Grand Rapids, Mich., for Yops, Crandell, Berrien County & Jewell.

## OPINION

ENSLEN, District Judge.

This opinion is intended to supplant the Court's oral opinion delivered at the hearing held on November 27, 1985. The instant case was brought by plaintiff, Leon Washington, suing on his own behalf and as the personal representative of the estate of his late brother, Hardy James, Jr. There are three separate groups of defendants in this action: (1) the City of Benton Harbor, the city's Public Safety Director, Sam Watson, and two police officers, Dean Starke and Dale Easton; (2) Benton Township, its Chief of Police, Jack Drach, and three police officers, Ronald Kienzle, Keith Diamond and Michael Krugh; and (3) Berrien County, its Sheriff, Forrest Jewell, and

two deputies, Thomas Yops and Maurice Crandell. The case arises out of the June 20, 1982 shooting death of Mr. James, plaintiff's decedent, and alleges violations of 42 U.S.C. §§ 1981, 1983, 1985(3) & 1986 and the fourth, fifth, sixth, eighth and fourteenth amendments to the United States Constitution, in addition to the pendent state claims of negligence, gross negligence and wrongful death.

The Court is currently considering three dispositive motions brought by various defendants. Defendants Starke, Easton and Watson have moved for summary judgment on plaintiff's claims against them in their individual capacities under § 1983 on the basis of qualified immunity. Defendants Yops, Crandell, Jewell and Berrien County have also moved to dismiss and/or for summary judgment on the following grounds: (1) that Yops, Crandell and Jewell, in their individual capacities, are qualifiedly immune from plaintiff's § 1983 claims; (2) that plaintiff has failed to state a claim under §§ 1981 and 1985 upon which relief can be granted; (3) that plaintiff's claim under § 1986 is barred by that section's one year statute of limitations; and (4) that Yops, Crandell, Jewell and Berrien County are all either immune or qualifiedly immune from plaintiff's pendent state claims. Defendant City of Benton Harbor has filed a motion to dismiss and/or for summary judgment claiming that the federal allegations against it fail to state a claim upon which relief can be granted and pleading governmental immunity from the pendent state claims. I note that defendants Benton Township, Drach, Kienzle, Diamond and Krugh have not filed any motions to dismiss or for summary judgment on their own behalf in this case, but they have joined the motions filed by the other defendants.

The facts giving rise to this action are, briefly, as follows. In the early morning hours of June 20, 1982, Mr. James and two accomplices broke and entered the Comet True Value Hardware Store in Benton Township. Officers Diamond and Kienzle responded to a B&E call and arrived at the scene shortly after 3:00 a.m., reporting a broken window. Soon thereafter, the other five officers arrived to provide backup assistance. Kienzle, Diamond and Yops entered the building while the other officers remained outside. Officer Kienzle alerted the others that he had discovered a large pile of guns near the broken window. Upon further investigation, Kienzle encountered Mr. James lying in the aisle but before an arrest could be made James fled toward the window entrance and the guns. Kienzle identified himself and ordered the suspect to halt but James continued to run toward the window and the weapons. Officer Kienzle then fired three shots from his .357, all missing the suspect. After James exited through the window, he struggled briefly with Deputy Crandell but eventually broke loose and continued to flee on foot in a westerly direction. While Krugh, Crandell and Starke pursued James, officers Kienzle, Diamond and Easton arrested his accomplices inside the store. Krugh, Crandell and Starke all shouted at the suspect to stop, but to no avail. Officer Krugh fired three rounds from his shotgun, apparently nicking James in the right hand. When he continued to run, Officer Starke fired two rounds from his .38, the second of which struck Mr. James in the back of the skull and killed him. The body was recovered 298 feet from the spot where Officer Starke shot.

Plaintiff's § 1983 claim is based upon the Supreme Court's March 27, 1985 ruling in *Tennessee v. Garner*, 471 U.S. ——, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In *Garner*, the Court held that the fourth amendment's prohibition of unreasonable seizures forbids the use of deadly force to prevent the escape of a suspected felon unless it is necessary to prevent the escape *and* the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. *Id.* 471 U.S. ——, 105 S.Ct. at 1697, 85 L.Ed.2d at 4. Therefore, *Garner* effectively overruled the common law, "fleeing felon" rule that allowed the use of deadly force as a last resort to apprehend a

fleeing felon and effect an arrest. While the fleeing felon rule was, at one time, followed in all common law jurisdictions, the Court noted that it had been increasingly eroded or abandoned in recent years. In particular, the Court cited a 1982 study that found that 86.8% of the nation's police departments had internal regulations restricting the use of deadly force to apprehend a nondangerous, escaping felony suspect. *Id.* 471 U.S. ——, 105 S.Ct. at 1705, 85 L.Ed.2d at 14 (citing K. Mantulia, *A Balance of Forces: A Report of the International Association of Chiefs of Police* 161 (1982) (table)).

Furthermore, the Court employed the familiar fourth amendment balancing principle in its analysis. As announced in *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner*, 471 U.S. at ——, 105 S.Ct. at 1699, 85 L.Ed.2d at 7. Considering the totality of the circumstances, the Court concluded that the government's interest in apprehending a nondangerous fleeing felon did not justify the use of deadly force. *Id.* 471 U.S. at ——, 105 S.Ct. at 1700, 85 L.Ed.2d at 8.

In determining whether a newly announced fourth amendment decision such as *Garner* is to be applied retroactively to pending criminal and civil/constitutional cases, courts look primarily to the novelty of the decision (i.e., whether it represents a clear break with settled precedent and police practices or merely extends an existing principle to a new fact situation). *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). Because the *Garner* decision was not entirely unanticipated in the law enforcement community and because it applied the well-known balancing test, at least one Circuit Court of Appeals has held that the new fleeing felon rule announced in that Opinion should, *theoretically*, apply retroactively. *See Acoff v. Abston*, 762 F.2d 1543, 1548–49 (11th Cir.1985). I emphasize the word "theo-

retically" because the *Acoff* court conceded that police officers might be protected from retroactive liability under *Garner* by the doctrine of qualified immunity. *Id.* at 1550.

██ The law of qualified immunity for public officials was recently purged of its subjective elements and reshaped into an entirely objective test. *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The *Harlow* Court stated that:

> [G]overnmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate *clearly established statutory or constitutional rights* of which a reasonable person would have known.
>
> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Id.* at 818, 102 S.Ct. at 2738 (emphasis added) (footnotes and citations omitted). Because qualified immunity is truly an immunity from suit, as opposed to a mere defense to liability, a defendant is entitled to a determination on the issue prior to the commencement of discovery. *Id.* For that reason, I suspended discovery in this case until I could decide these motions. Furthermore, the Supreme Court held just this summer that a denial of a motion raising qualified immunity is immediately appealable. *See Mitchell v. Forsyth*, 472 U.S.

——, ——, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411, 425 (1985).

■ The real question in this case, as in all cases involving the claim of wralified immunity, is whether the conduct of the individual defendants violated a clearly established constitutional or statutory right, and if so, whether the individual defendants should reasonably have been aware of that right at the time of their actions. Again I must stress that the reasonableness of defendants' actions is an entirely objective inquiry; all other circumstances, be they subjective knowledge or expectations, are irrelevant for purposes of qualified immunity. *Davis v. Scherer*, 468 U.S. 183, ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139, 147 (1984). In the instant case, there were no "statutes" per se controlling the individual defendants' conduct. Therefore, this court must determine whether there was a clearly established constitutional right of plaintiff's decedent, as of June 20, 1982, not to be shot as a fleeing felon by any or all of the individual defendants.

■ A constitutional right or entitlement of the type asserted here may be of two origins. It may arise directly from the text of the Constitution as interpreted by the courts. An example of this is the fourth amendment right announced in *Garner*. Alternatively, it may arise out of the substantive laws and regulations of the states, and be protected by the due process clause of the fourteenth amendment. *See generally Meachum v. Fano*, 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2537–40, 49 L.Ed.2d 451 (1976).

[4] A review of the constitutional common law as of June 20, 1982, reveals that there was no "clearly established constitutional right" not to be shot under the "fleeing felon" rule. As I have already indicated, the U.S. Supreme Court addressed the issue for the first time in the 1985 *Garner* decision. Certainly other courts had struck down the rule. *See e.g., Sauls v. Hutto*, 304 F.Supp. 124 (E.D.La.1969); *People v. Ceballos*, 12 Cal.3d 470, 116 Cal. Rptr. 233, 526 P.2d 241 (1974); *Rose v. State*, 431 N.E.2d 521 (Ind.App.1982); *Gi-*

*ant Food, Inc. v. Scherry*, 51 Md.App. 586, 444 A.2d 483 (1982). However, the Sixth Circuit Court of Appeals had, on more than one occasion, refused to hold that the fleeing felon rule was unconstitutional or overturn statutes codifying its terms. *See Garner v. Memphis Police Dep't.*, 600 F.2d 52 (6th Cir.1979), *rev'd*, —— U.S. ——, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Wiley v. Memphis Police Dep't*, 548 F.2d 1247 (6th Cir.), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977); *Beech v. Melancon*, 465 F.2d 425 (6th Cir.1972), *cert. denied*, 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973). Similarly, less than four months before the incident giving rise to the instant litigation, the Michigan Court of Appeals had expressly upheld the common law fleeing felon rule in this state. *Werner v. Hartfelder*, 113 Mich.App. 747, 318 N.W.2d 825 (1982), *leave to appeal denied*, 418 Mich. 906, 342 N.W.2d 520 (1984). *See also People v. Gonsler*, 251 Mich. 443, 232 N.W. 365 (1930). Since the controlling precedent in 1982 in both state and federal courts specifically upheld the common law fleeing felon rule, it cannot be said that the acts of the individual defendants on that fateful night violated any "clearly established" common law-constitutional right.

Nevertheless, the question remains whether that right was clearly established by means of legislative or administrative action. As I have already stated, Michigan had no statutory law on point. *See Garner*, 471 U.S. at —— n. 16, 105 S.Ct. at 1704 n. 16, 85 L.Ed.2d at 13 n. 16. That leaves the issue of administratively created constitutional rights. In *Davis v. Scherer*, *supra*, the Supreme Court discussed the impact of state regulations on the question of an official's qualified immunity. In *Davis*, the lower courts had held that while a state employee's discharge was not in violation of clearly established due process principles, the Florida officials responsible for the discharge had nevertheless forfeited their qualified immunity from § 1983 liability because they had not followed clear administrative regulations and their conduct was not otherwise reasonable. In re-

versing this ruling, the Supreme Court held that the mere violation of a state statute or administrative regulation does not cause a public official to lose his qualified immunity unless the statute or regulation itself creates a constitutional entitlement, the violation of which would give rise to § 1983 liability. *Davis,* 468 U.S. at —— & n. 12, 104 S.Ct. at 3019–20 & n. 12, 82 L.Ed.2d at 149–50 & n. 12. In justification of this ruling, the Court offered the following:

> Appellee proposes that his new rule for qualified immunity be limited by requiring that plaintiffs allege clear violation of a statute or regulation that advanced important interests or was designed to protect constitutional rights. Yet, once the door is opened to such inquiries, it is difficult to limit their scope in any principled manner. Federal judges would be granted large discretion to extract from various statutory and administrative codes those provisions that seem to them sufficiently clear or important to warrant denial of qualified immunity. And such judgments fairly could be made only after an extensive inquiry into whether the official in the circumstances of his decision should have appreciated the applicability and importance of the rule at issue. It would become more difficult, not only for officials to anticipate the possible legal consequences of their conduct, but also for trial courts to decide frivolous suits without protracted litigation.

*Id.* 468 U.S. at ——, 104 S.Ct. at 3020–21, 82 L.Ed.2d at 150–51 (footnote omitted).

Subsequent to *Davis,* the Sixth Circuit decided the case of *Spruytte v. Walters,* 753 F.2d 498 (6th Cir.1985). In that case, the court determined that a state regulation allowing prison inmates to receive books that did not threaten prison security created a type of property or liberty interest that was protected by fourteenth amendment due process, and that a policy directive of the Michigan Department of Corrections that prohibited inmates from receiving books except from publishers was inconsistent with the state regulation and, hence, invalid. The court went on to hold that the state regulation created a clearly

established constitutional right of which the defendant prison administrators should reasonably have been aware. For that reason, the state officials lost their qualified immunity from a cause of action for damages under § 1983 resulting from their refusal to allow an inmate to receive a paperback dictionary from his mother. In distinguishing the facts of *Spruytte* from the facts of *Davis,* the Sixth Circuit noted that:

> in the context of a violation of due process, the critical distinction between regulations that bear upon the constitutional right and those that do not is collapsed into the distinction between regulations that give rise to the protected interest and regulations that merely provide what process is due once a protected interest has been found.... Violation of a state regulation that defines specific substantive predicates becomes relevant because state law determines whether a claimant has a protected interest.

*Id.* at 511.

In the case at bar, plaintiff argues that there were indeed "regulations" bearing upon and giving rise to the constitutional right he asserts, not in the form of a state administrative rule but rather intradepartmental policies of the defendant police departments. The Benton Harbor Police Department had in effect, at the time of the shooting, Departmental General Order 76–10–12–A, which provided in pertinent part:

> A. FIREARMS MAY BE USED IN THE FOLLOWING SITUATIONS:
>
> ....
>
> 4. *Fleeing Offender*—Only when it is a known felon who has used, or threatened to use, deadly force in the commission of a crime and all other attempts to prevent the escape have failed. An important aspect in making the decision to use deadly force is:
>
> a. Whether or not to delay the arrest may result in additional injury or death to officer or other persons.
>
> b. The likelihood of a non-violent apprehension at a later date.
>
> ....

B. FIREARMS SHALL NOT BE USED IN THE FOLLOWING INSTANCES:

. . . .

5. *Suspicion of Felony*—Deadly force shall not be used on mere suspicion that a crime, no matter how serious, has been committed, or that the person being sought committed the crime. The officer either should have witnessed the crime or have sufficient and reliable information to *know* as a virtual certainty that the suspect committed an offense in which deadly force was used or threatened.

. . . .

** Note that the crime of burglary in and of itself is *not* considered a violent felony. Therefore, deadly force *shall not* be used to prevent the escape of a burglary suspect. Better a delayed apprehension of a suspect, who in many cases is a juvenile, than placing an officer in legal jeopardy.

The purpose of this General Order, issued by the City's Police Chief in 1976, was to "provide the officer with guidelines which will result in the proper and legal use of firearms and protect the officer from subsequent criminal or civil action." The Chief noted in the introductory comments to the order that, at least in 1976, Michigan law regarding the use of deadly force in the apprehension of fleeing felons was unclear. The upshot of the order was not that it *was* unconstitutional, either under state or federal law, to use deadly force in such situations, but from the aspect of the department and the individual officer, it was better to be safe than sorry. It also appears that the Berrien County Sheriff's Department had a similar intradepartmental regulation in effect at the time of the incident. From the evidence that I have received, and from the representations made to me by counsel, it further appears that the Benton Township Police Department did *not* have such a policy, but rather followed the Michigan common law as announced in *Werner v. Hartfelder, supra.*

The Benton Harbor department's regulation is phrased in such a way that it restricts the officer's discretion in the use of deadly force. In this respect, an analogy could be drawn to the prison transfer case of *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) and its progeny, which held that the use of mandatory language in a state statute which substantially restricts the discretion of a public official ..in otherwise discretionary functions may create a protected liberty interest in the prisoner. *See id.* at 470–73, 103 S.Ct. at 870–72. However, a strong counter argument could be made that since the instant departmental order's restrictions turned on the observations and conclusions of the individual officer, it did not "substantially restrict" the officers discretion in the use of deadly force. Because the officers at the scene were told that the suspect had been in the vicinity of a pile of weapons inside the building, and because the suspect had already struggled with Deputy Crandell, they might have concluded that Mr. James was armed and dangerous and that the use of deadly force was fully justified under the regulations. To my knowledge, no federal reported opinion has discussed the effect of such disputed and subjective factual considerations on the issue of qualified immunity in a *Garner*-type situation. Fortunately, I need not decide that issue here for other issues control.

■ In my opinion, the intradepartmental policies or regulations of the Benton Harbor Police Department and the Berrien County Sheriff's Department did not have the force and effect of state law or administrative regulation. For that reason, they could not and did not create a protected liberty interest in plaintiff's decedent not to be shot as a fleeing felon. Although all parties have filed numerous briefs on this issue, no persuasive authority has been cited to me, and I have found none in my own exhaustive research, indicating that a local governmental department with no statutory rule making authority can create such a constitutional interest through its own departmental policies. It would be quite ironic if the instant regulations did create such a right. Were that

the case, plaintiff's cause of action under § 1983 would depend entirely upon which officer from which department actually shot him. Had he been shot by an officer from Benton Township (and it appears that he was shot and wounded by defendant Krugh), he would have no § 1983 claim because Benton Township followed the common law rule allowing the apprehension of fleeing felons by the use of deadly force. It would be ludicrous to hold that an individual's cause of action for deprivation of constitutionally protected liberty interests depends upon whose bullet strikes him when the state and federal law in force at the time plainly allowed all of the officers to shoot at him. For these reasons, I conclude that there was no clearly established constitutional or statutory law restricting the individual defendants' discretionary conduct and, hence, the individual defendants are entitled to qualified immunity from damage liability from plaintiff's § 1983 claim.

■ I now turn my attention to the remaining issues in the Berrien County defendants' motion to dismiss. Defendants claim that plaintiff's §§ 1981 and 1985 claims should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because they are insufficiently pled. Section 1981 prohibits the denial of equal protection under the law on the basis of race. Section 1985 prohibits racially based conspiracies to deny an individual his civil rights. Because I find that plaintiff's complaint sufficiently alleges that his decedent was denied his civil rights on the basis of racial animus and pursuant to a conspiracy evidenced by the actions and practices of the defendants, defendants' motion is, in this respect, denied. *See Leonard v. City of Frankfort,* 752 F.2d 189 (6th Cir.1985) (§ 1981); *Marlowe v. Fisher Body,* 489 F.2d 1057 (6th Cir.1973) (§ 1985).

■ Defendants also move to dismiss plaintiff's claim under 42 U.S.C. § 1986 as untimely. Section 1986 specifically provides that "no action under the provisions of this section shall be sustained which is not commenced within one year after the

cause of action has accrued." Plaintiff's cause of action accrued on June 20, 1982. The instant complaint was not filed in this court until May 22, 1985. Therefore, the § 1986 claim is untimely and must be dismissed. Defendants' motion is granted in this respect.

The Berrien County defendants also claim that plaintiff's pendent state claims should be dismissed for various reasons. Because this court has not yet decided whether it should exercise pendent jurisdiction over these State claims, I will reserve ruling on this aspect of defendants' motion with the following exception. Any state cause of action against Sheriff Jewell is untimely as brought outside the two-year statute of limitations period of M.C.L.A. 600.5805(5). Thus, the pendent claims against defendant Jewell are dismissed.

■ Finally, the City of Benton Harbor has filed a motion to dismiss and/or for summary judgment accompanied by a skeletal, one-page brief in support thereof. Although it is not set out in any understandable form, it appears to argue that the City is entitled to some form of qualified immunity from plaintiff's federal claims. Qualified immunity is, of course, unavailable to municipalities. *Brandon v. Holt,* 469 U.S. ——, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). This aspect of the city's motion is denied. The remainder of the motion goes to plaintiff's pendent state claims. Once again, I will reserve judgment on these issues until such time as the court determines that pendent jurisdiction should be exercised over these claims.