855 F.2d 346
 Leon WASHINGTON, suing on his behalf and as personal
representative of the Estate of Hardy James, Jr.,
Plaintiff-Appellant,
v.
Dean STARKE; Dale Easton; Benton Township; The City of
Benton Harbor; and Sam Watson, Defendants-Appellees,
Ronald Kienzle; et al., Defendants.
 No. 86-1717.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 29, 1987.
Decided Aug. 26, 1988.
 
 Riccardo D. Arcaro (argued), Gould & Arcaro, P.C., Grand Rapids, Mich., for plaintiff-appellant.
 Timothy Downs (argued), Craig, Farber, Downs & Dise, Detroit, Mich., Ronald G. Morgan, Morgan & Fuzak, P.C., East Lansing, Mich., for defendants-appellees.
 Before KEITH, MILBURN and NORRIS, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Plaintiff-appellant Leon Washington, suing on his behalf and as the personal representative of the Estate of Hardy James, Jr., appeals the district court's order granting summary judgment wherein the court found that the individual defendants were entitled to qualified immunity and dismissed the pendent state claims. For the reasons that follow, we affirm.I.
 
 
 2
 During the early morning hours of June 20, 1982, Hardy James, Jr., and two accomplices were in the process of burglarizing Comet True Value Hardware in Benton Township, Berrien County, Michigan. Officers Keith Diamond and Ronald Kienzle of the Benton Township Police Department responded to a breaking and entering call and arrived at the hardware store shortly after 3:00 a.m. and, upon arrival, reported a broken window. Shortly thereafter, two police officers from the City of Benton Harbor, Michigan, Dean Starke and Dale Easton; two deputies of the Berrien County Sheriff's Department, Thomas Yops and Maurice Crandell; and Benton Township Police Officer Michael Krugh arrived to provide backup assistance.
 
 
 3
 Kienzle, Diamond and Yops entered the building while the other officers remained outside. Officer Kienzle alerted the others that he had discovered a large pile of guns near the broken window. Upon further investigation, Kienzle discovered Hardy James, Jr., hiding in an aisle. Before an arrest could be made, James fled toward the window entrance and the large pile of weapons. Kienzle identified himself as a police officer and ordered James to halt, but James did not respond and continued to run toward the broken window and pile of weapons. Kienzle then fired three rounds from his .357 revolver, all missing James. James then jumped out of the building through the broken window, encountered Deputy Crandell, and the two struggled briefly. However, James eventually broke loose and continued to flee on foot.
 
 
 4
 While Officers Krugh, Crandell and Starke pursued James, the other officers remained on the scene with James' accomplices. Officers Krugh and Crandell also shouted at James to stop, but to no avail. Officer Krugh then fired a round from his shotgun, apparently nicking James in the right hand. Krugh then heard Crandell warn James to stop or he would shoot. Continuing pursuit, Krugh again warned James to stop, and when he did not, Krugh fired two more rounds from his shotgun at James. The three officers continued to pursue James, and Officer Starke fired two rounds from his .38 revolver, the second of which struck Hardy James, Jr., in the back of the skull and killed him. The body was recovered 298 feet from the spot where Officer Starke fired.
 
 
 5
 This action was filed by plaintiff Leon Washington, suing on his behalf and as the personal representative of the Estate of Hardy James, Jr., pursuant to 42 U.S.C. Secs. 1981, 1983, 1985, and 1986, alleging that the various defendants violated decedent's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, in addition to pendent state claims of negligence, gross negligence, and wrongful death.
 
 
 6
 There were originally three separate groups of defendants in this action: (1) the City of Benton Harbor, Michigan, its Public Safety Director, Sam Watson, and two police officers, Dean Starke and Dale Easton; (2) Benton Township, Michigan, its Chief of Police, Jack Drach, and three police officers, Ronald Kienzle, Keith Diamond, and Michael Krugh; and (3) Berrien County, Michigan, its Sheriff, Forrest Jewell, and two deputies, Thomas Yops and Maurice Crandell.
 
 
 7
 The district court entered judgment on the various defendants' motions for summary judgment. The district court held that the individual defendants were entitled to qualified immunity from liability on plaintiff's section 1983 claim. The district court also dismissed plaintiff's section 1986 claim as being untimely, and dismissed plaintiff's pendent state claims against defendant Sheriff Jewell for being untimely as well. Washington v. Starke, 626 F.Supp. 1149 (W.D.Mich.1986).
 
 
 8
 At a later hearing on January 30, 1986, the district court dismissed plaintiff's remaining pendent state claims without prejudice. After that dismissal, plaintiff filed those claims in the Berrien County, Michigan, Circuit Court. After a hearing on May 15, 1986, a settlement was reached of the remaining federal claims, and the district court entered an order on June 24, 1986, dismissing plaintiff's action with prejudice.
 
 
 9
 Plaintiff-appellant raises two issues in this appeal. First, he argues that the district court erred in dismissing the plaintiff's section 1983 action against the individual defendants on the basis of qualified immunity. Second, he argues that the district court erred in dismissing the plaintiff's pendent state claims.
 
 II.
 
 10
 Generally, a section 1983 claim must be predicated on the deprivation of a federal constitutional right, as a right guaranteed only under state law is inadequate. Bird v. Summit County, Ohio, 730 F.2d 442 (6th Cir.1984) (per curiam). Alternatively, the constitutional right may arise out of the substantive laws and regulations of a state and be protected by the due process clause of the Fourteenth Amendment. See Beard v. Livesay, 798 F.2d 874 (6th Cir.1986); Franklin v. Aycock, 795 F.2d 1253 (6th Cir.1986). In the present case, as the district court noted,[1] "[p]laintiff's Sec. 1983 claim is based upon the Supreme Court's March 27, 1985 ruling in Tennessee v. Garner, 471 U.S. , 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)." Washington, 626 F.Supp. at 1151.
 
 
 11
 We recently held in Carter v. City of Chattanooga, 850 F.2d 1119 (6th Cir.1988) (en banc), that Garner would only be applied prospectively. As the shooting at issue in this appeal occurred six months before the shooting at issue in Carter, the Court's holding in Garner cannot be used as a basis for plaintiff's section 1983 claim. Arguably, plaintiff is also claiming a denial of the decedent's substantive due process rights as protected by the Fourteenth Amendment as a basis for a section 1983 action, under the law as it existed at the time of the shooting. See Landrum v. Moats, 576 F.2d 1320, 1325 (8th Cir.), cert. denied, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978) (fleeing felon rule found violative of substantive due process). Therefore, we will consider the merits of plaintiff's argument that the district court improperly held that the individual defendants were entitled to qualified immunity.
 
 
 12
 In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court rejected the inquiry into the state of mind of the person seeking immunity in favor of a wholly objective standard for determining whether or not qualified immunity exists. The Court found that public officials[2] "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. As the Supreme Court later noted in Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), "[w]hether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.' No other 'circumstances' are relevant to the issue of qualified immunity." Davis, 468 U.S. at 191, 104 S.Ct. at 3017 (citation omitted). Thus, the central issue in the present case is whether a reasonable police officer could have believed, in light of clearly established law, that the use of deadly force was lawful under the circumstances. See Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).
 
 
 13
 In the present case, it is undisputed that at the time of the shooting, controlling precedent in this circuit and in Michigan courts specifically upheld the common law fleeing felon rule, which permitted the use of deadly force to prevent the escape of a fleeing felon. It is also undisputed that Michigan had no statutory law on point at the time of the shooting. See Washington, 626 F.Supp. at 1153. Thus, the next question for consideration is whether or not a substantive right in the plaintiff's decedent was clearly established by administrative action.
 
 
 14
 It is further undisputed that there were no state administrative rules or regulations that would establish such a right at the time of the shooting. The only basis for asserting the existence of a constitutional right that would operate to preclude the application of qualified immunity can be found in the intra-departmental policies and regulations of the defendant police departments. Specifically, the Benton Harbor Police Department and the Berrien County Sheriff's Department had similar intra-departmental regulations in effect at the time of the shooting that indicated that the actions of the officers were improper.[3] The important aspects of the Benton Harbor intra-departmental guidelines are set out as follows:
 
 
 15
 A. FIREARMS MAY BE USED IN THE FOLLOWING SITUATIONS:
 
 
 16
 * * *
 
 
 17
 4. Fleeing Offender --Only when it is a known felon who has used, or threatened to use, deadly force in the commission of a crime and when all other attempts to prevent escape have failed. An important aspect in making a decision to use deadly force is:
 
 
 18
 (a) Whether or not to delay the arrest may result in additional injury or death to officer or other persons.
 
 
 19
 (b) The likelihood of a nonviolent apprehension at a later date.
 
 
 20
 * * *
 
 
 21
 B. FIREARMS SHALL NOT BE USED IN THE FOLLOWING INSTANCES:
 
 
 22
 5. Suspicion of Felony --Deadly force shall not be used on mere suspicion that a crime, no matter how serious, has been committed, or that the person being sought committed the crime. The officer should either have witnessed the crime or have sufficient and reliable information to know as a virtual certainty that the suspect committed an offense to which deadly force was used or threatened.
 
 
 23
 * * *
 
 
 24
 ** NOTE that the crime of burglary in and of itself is not considered a violent felony. Therefore, deadly force shall not be used to prevent the escape of a burglary suspect. Better a delayed apprehension of a suspect, who in many cases is a juvenile, than placing an officer in legal jeopardy.[4]
 
 
 25
 After reviewing the above guidelines, the trial court properly concluded that "[t]he upshot of the order was not that it was unconstitutional, either under state or federal law, to use deadly force in such situations, but from the aspect of the department and the individual officer, it was better to be safe than sorry." Washington, 626 F.Supp. at 1155 (emphasis in original). At the time of the shooting, the Benton Township Police Department did not have such a policy, but rather followed the Michigan common law allowing the use of deadly force to apprehend a fleeing felon. See Washington, 626 F.Supp. at 1156.
 
 
 26
 In determining whether state-enacted rules create a protected liberty interest, the key is "whether or not the state has imposed 'substantive limitations' on the discretion of [officers] ... or, in other words, whether the state 'has used language of an unmistakably mandatory character.' " Franklin, 795 F.2d at 1260 (citations omitted). The mandatory nature of the regulation is the key, as a plaintiff "must have a legitimate claim of entitlement to the interest, not simply a unilateral expectation of it." Bills v. Henderson, 631 F.2d 1287, 1292 (6th Cir.1980).
 
 
 27
 The above regulation does not remove officer discretion in the use of deadly force, but simply gives criteria to be used in the exercise of that discretion. While the regulation does restrict the officer's discretion through the use of the above criteria, the restrictions still turn on the observations and conclusions of the individual officer and, therefore, do not substantially restrict his use of deadly force.
 
 
 28
 Moreover, "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." Davis, 468 U.S. at 194, 104 S.Ct. at 3019.
 
 
 29
 Such officials as police officers or prison wardens, to say nothing of higher level executives levels who enjoy only qualified immunity, routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them. These officials are subject to a plethora of rules, "often so voluminous, amibiguous, and contradictory, and in such flux that officials can only comply with or enforce them selectively."
 
 
 30
 Davis, 468 U.S. at 196, 104 S.Ct. at 3020 (quoting P. Shuck, Suing Government, 66 (1983)).
 
 
 31
 Therefore, "officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages." Davis, 468 U.S. at 194 n. 12, 104 S.Ct. at 3019 n. 12. In sum, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right[,]" and "in the light of preexisting law the unlawfulness must be apparent." Anderson, 107 S.Ct. at 3039.
 
 
 32
 The critical question is whether the intra-departmental regulations created a constitutionally protected interest, or whether the intra-departmental regulations established procedures and guidelines for protecting what is now, but was not at the time, a recognized Fourth Amendment right against unreasonable seizure through the use of deadly force. See Spruytte v. Walters, 753 F.2d 498 (6th Cir.1985), cert. denied, 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 767 (1986). Violation of the intra-departmental regulation would not have given rise to a cause of action for damages under either federal or Michigan law at the time of the shooting. The purpose of the regulation was not to prohibit the use of deadly force, but to offer guidelines and criteria for officers to use in their determination of when deadly force was proper. While the officer in question mav have been subject to intra-departmental disciplinary action, his action did not constitute a wrong recognized by federal or state law. Therefore, violation of the regulation does not preclude the application of qualified immunity to the individual officers.
 
 
 33
 Finally, we find that no matter how mandatory or nondiscretionary the intra-departmental regulation is characterized, it can never preclude the application of qualified immunity as long as it is in clear contradiction with Michigan and federal law. Plainly stated, a police chief, through the issuance of an intra-departmental regulation without any formal rule-making procedure, cannot create a constitutional equivalent of an act of the legislature or of the state that can overturn the clear common law of the state.
 
 
 34
 Otherwise, had officers from the different government entities of the City of Benton Harbor and Benton Township fired at nearly the same instant, which could easily have happened in the present case, the existence of a section 1983 cause of action would depend upon whose bullet actually killed the decedent. If both bullets were equally fatal, it would be illogical for only one officer to be liable. As the district court noted, "[i]t would be ludicrous to hold that an individual's cause of action for deprivation ofconstitutionally protected liberty interest depends upon whose bullet strikes when the state and federal law in force at the time plainly allowed all of the officers to shoot at him." Washington, 626 F.Supp. at 1156. Therefore, we find that the district court properly dismissed plaintiff's section 1983 action on the basis of qualified immunity.
 
 
 35
 Plaintiff also argues that the district court abused its discretion in dismissing plaintiff's pendent state claims. We disagree. It is a clear rule of this circuit that if a plaintiff has not stated a federal claim, his pendent state law claims should be dismissed. See Hooks v. Hooks, 771 F.2d 935, 944-45 (6th Cir.1985); Bird, 730 F.2d at 444.
 
 III.
 
 36
 Accordingly, for the reasons stated, the opinion of the district court is AFFIRMED.
 
 
 
 [1]
 Plaintiff stipulated at oral argument that his cause of action was based solely on Garner
 
 
 [2]
 The Supreme Court has recently made it clear that police officers are considered public officials and therefore entitled to qualified immunity when appropriate. Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)
 
 
 [3]
 In the cover letter accompanying General Order 76-10-12-A, issued October 12, 1976, Chief Rodez of the Benton Harbor Police Department indicated that the purpose of the policy was to establish policy, rule, and procedure with regard to the use of firearms. Specifically, the police chief noted his belief that the law of the State of Michigan was imprecise as to when deadly force could be used, and that the regulations were to provide the officer with guidelines to protect the officer from subsequent criminal or civil action as a result of his use of deadly force
 
 
 [4]
 Benton Harbor Police Departmental Order # 76-10-12-A