Mariam LONG, Curtis Long, Anita Simmers, James Marlin Hodges, Karen Mills, and Ronnie S. Mills, Plaintiffs–Appellees,

v.

Steven NORRIS, Individually and as Commissioner of the Tennessee Department of Corrections, Linda Roberts, Sam Chapman, Lisa Marshall, Irene Ladd, James Worthington, Charles Jones, Ruby Spakes, Gladys Noe, Char-lene Smith, Barbara Wright, Kathy Hill, Linda Shipwash, Tom Mays, Dale Roberts Evans, Angie Thomas, Charles Brown, Sheena Ward, Teresa (Last Name Unknown), and Jackie Cornell, Defendants,

Otie Jones, Individually and as Warden of the Morgan County Regional Correctional Facility, M.C. Hamby, Associate Warden, Defendants–Appellants.

Nos. 89–5377, 89–5378, 89–5379.

United States Court of Appeals, Sixth Circuit.

Argued May 3, 1990.

Decided April 3, 1991.

Rehearing Denied April 29, 1991.

William Allen (argued), Rural Legal Services of Tennessee, Oak Ridge, Tenn., Carol S. Nickle, Knoxville, Tenn., for plaintiffs-appellees.

Joe R. Judkins (argued), Wartburg, Tenn., for defendants-appellants.

Before MARTIN and BOGGS, Circuit Judges, and HACKETT, District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Defendants-appellants are the warden and associate warden of the Morgan County (Tennessee) Regional Correctional Facility. The wardens filed this interlocutory appeal in these consolidated civil rights actions brought under 42 U.S.C. § 1983. Each of the three consolidated cases has two plaintiffs, one of whom was an inmate at the Morgan County prison during the relevant time period and one of whom was the inmate's spouse or fiancee who visited the inmate during the relevant time period. The plaintiffs claim that their constitutional rights were violated by strip and body cavity searches of the visitor plaintiffs—conducted without probable cause by prison guards—and by the searches' effect of chilling the inmate plaintiffs' rights to visitation. On appeal, the wardens argue that the district court erred in denying their motion for dismissal or summary judgment on the basis of their asserted qualified im-

* The Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation.

munity.[1] We affirm in part and reverse in part.

The wardens authorized at least two strip searches or body cavity searches of each of the visiting plaintiffs during 1984 and 1985. Prison guards told the visiting plaintiffs that they would not be allowed to visit their husbands or fiances unless the visiting plaintiffs submitted to the searches. Plaintiff Mariam Long's visitation rights were suspended for sixty days because she refused to undergo a manual body cavity search. None of the searches revealed any contraband or any other evidence of criminal conduct.

The plaintiffs filed separate complaints in this now-consolidated lawsuit during December 1985. They alleged that the searches violated the visiting plaintiffs' fourth amendment rights to freedom from unreasonable searches and seizures. The inmate plaintiffs also alleged that the wardens violated the inmate plaintiffs' fourteenth amendment liberty interest in visitation, created by Tennessee prison regulations. Tennessee prison regulations state that inmates "shall" have visitation rights, Tenn. Dep't. of Corrections Policy No. 501.01, V.B., and that visitation rights may be suspended only for "good cause," *id.* at No. 507.01, VI, Procedures § E(5). Tennessee prison regulations require that a prison official have probable cause to believe that a prison visitor is concealing contraband before the official may authorize a strip search or a visual or manual body cavity search of the prison visitor. *Id.* at No. 506.06, V.B.[2] The plaintiffs' final allegation was that the searches violated their first amendment right to freedom of association.

On January 6, 1988, the wardens moved for dismissal or summary judgment on the basis of qualified immunity. The wardens admitted that they authorized the searches without probable cause in violation of Tennessee prison regulations. The wardens averred that they had a reasonable suspicion that the plaintiffs were smuggling contraband, based on confidential information from unnamed "reliable informants." The wardens contended that by acting on their suspicion, they did not violate clearly established constitutional law. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The district court rejected this contention and denied the wardens' motion to dismiss on February 15, 1989.

■ Although appellate courts usually lack jurisdiction to hear appeals of denials of motions for summary judgment, the denial of motions for summary judgment asserting qualified official immunity falls within an exception to this general rule. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Huron Valley Hospital v. City of Pontiac*, 792 F.2d 563, 566–67 (6th Cir.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986).[3] Interlocutory appeal of the denial of summary judgment motions asserting qualified immunity is warranted because qualified immunity is not merely a defense to a law suit—it is an "entitlement" not to be sued at all. *Mitchell*, 472 U.S. at 525–27, 105 S.Ct. at 2814–16; *Huron Valley*, 792 F.2d at 567. Qualified immunity engages so early because liability is not the sole public danger of law suits against public officials. The threat of liability and necessary attention to pretrial matters, such as discovery, distract public officials from effectively

---

1. The wardens also sought review of the district court's grant of plaintiffs' motions to compel discovery and for attorney's fees resulting from the wardens' failure to cooperate with discovery. We dismissed these issues under 28 U.S.C. § 1292 as unappealable without a final decision in an order entered on October 12, 1989.

2. This policy states in full:
 Strip, visual body cavity and/or manual body cavity searches of the persons of visitors and employees may only be conducted when they

are specifically authorized regarding a particular person and shall only be authorized when there is *probable cause* to believe the person is concealing contraband.
Tenn. Dep't. of Corrections Policy No. 506.06. V.B. (emphasis added).

3. Although *Mitchell* was a constitutional tort action against a federal official, a suit against a state official under section 1983 is treated the same for purposes of qualified immunity. *Butz v. Economou*, 438 U.S. 478, 500–01, 98 S.Ct. 2894, 2907–08, 57 L.Ed.2d 895 (1978).

performing their government functions and discourage able persons from entering public service. *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815; *Harlow v. Fitzgerald,* 457 U.S. at 816–17, 102 S.Ct. at 2737–38. Interlocutory appeal is appropriate because the entitlement not to be sued is "lost forever" if an immune public official is required to litigate the case all the way to trial. *Huron Valley,* 792 F.2d at 567.

 Application of qualified immunity to a particular defendant is a question of law. *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988). As such, our review is *de novo.* The standard for qualified immunity is that government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. The parties do not dispute that the plaintiffs seek civil damages, or that the wardens' actions in approving searches based on an alleged reasonable suspicion constitute "discretionary functions" under *Harlow.*

Thus, we venture once more into the labyrinth of deciding what makes a right "clearly established" for purposes of qualified immunity. In *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court held that qualified immunity protected a former United States Attorney General from suit for authorizing a warrantless wiretap in a matter involving domestic security. Immunity applied because the unconstitutionality of warrantless wiretaps was not clearly established at the time of the Attorney General's wiretap authorization in November 1970. Two years after Attorney General Mitchell's authorization of the wiretap, the Supreme Court declared such wiretaps unconstitutional in *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (holding warrantless wiretaps involving domestic threats to national security unconstitutional). In *Mitchell,* the Court stated that the constitutional right prohibiting warrantless wiretaps was

not clearly established if there remained a "legitimate question whether an exception to the warrant requirement exists." 472 U.S. at 535, 105 S.Ct. at 2820. A "legitimate question" obviously existed in *Mitchell* because at the time Attorney General Mitchell authorized the warrantless wiretap, some district courts had approved warrantless wiretaps in cases of domestic security. *Id.* (citing *United States v. Dellinger,* No. 69 CR 180 (N.D.Ill. Feb. 20, 1970), *rev'd,* 472 F.2d 340 (7th Cir.1972) (the "Chicago 7" case) and *United States v. O'Neal,* No. KC–CR–1204 (D.Kan. Sept. 1, 1970), *appeal dismissed,* 453 F.2d 344 (10th Cir.1972)); *see Dominque v. Telb,* 831 F.2d 673 (6th Cir.1987) (the question in *Mitchell* regarding the clear establishment of a constitutional right was "not a particularly difficult one"). As a result, the Court did not delve in detail into when an official would have a "legitimate question" as to the constitutionality of his or her action. However, the Court stated that a previous case with "identical circumstances was not needed to find that a law was clearly established." *Id.* 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12.

In *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987), the Court provided more guidance on the "legitimate question" issue and held that in order for a constitutional right to be clearly established, the law must be clear in regard to the official's particular actions in the particular situation. The Court stated:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that it light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039 (citations omitted). The Court in *Anderson* recognized that qualified immunity is not overcome merely by general allegations that a clearly established constitutional right has been violated. Rather, the particular conduct of

the responsible official must fall clearly within the area protected by the constitutional right, such that a reasonable official would know that his or her conduct violated the constitutional right. 483 U.S. at 640–41, 107 S.Ct. at 3039–40. It was on this ground that the Court in *Anderson* found that the court of appeals had erred in denying qualified immunity. *Id.* at 641, 107 S.Ct. at 3039. The Court emphasized that a fact-specific analysis would maintain "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Id.* at 639, 107 S.Ct. at 3039. The Court sought to avoid "making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Id.* (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)).

■ We use an "objective reasonableness" standard to determine whether an official could reasonably anticipate that a constitutional right is clearly established. *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738; *Masters v. Crouch,* 872 F.2d 1248, 1251 (6th Cir.) (Lively, J.), *cert. denied sub nom. Frey v. Masters,* — U.S. —, 110 S.Ct. 503, 107 L.Ed.2d 506 (1989). As applied in *Anderson v. Creighton,* the objective reasonableness test focuses on whether an official, given the facts that the official knew or reasonably should have known about the situation, should have known that his or her particular conduct would not pass scrutiny when applied to the law. 483 U.S. at 641, 107 S.Ct. at 3040; *Wood v. Ostrander,* 851 F.2d 1212, 1218 (9th Cir.1988) ("The immunity standard considers whether a reasonable [official] should view the [previous case law] as controlling."). Public officials are expected to be aware of the state of clearly established law governing their conduct. The Eighth Circuit has stated that "state employees may not rely on their ignorance of even the most esoteric aspects of the law to deny individuals their due process rights." *Wentz v. Klecker,* 721 F.2d 244 (8th Cir. 1983). In determining whether a constitutional right is clearly established in a given situation, we "look first to the decisions of the Supreme Court, then to decisions of this court and other courts within this circuit, and finally to decisions of other circuits." *Crouch,* 872 F.2d at 1251–52 (citations omitted). With these general official immunity principles in mind, we turn to the specific allegations of unconstitutional activity in this case.

### I. Search and Seizure Rights

■ Plaintiffs allege that qualified immunity does not apply because the wardens violated the prison visitors' clearly established fourth amendment right to be free from strip and body cavity searches absent probable cause. To show the existence of a clearly established fourth amendment right, plaintiffs rely on precedents of other circuits and Tennessee prison regulations requiring probable cause for a strip search of a prison visitor. We note that although Tennessee prison regulations may create a constitutional entitlement under the due process clause of the fourteenth amendment, they cannot change the standard of analysis for constitutional issues arising under the fourth amendment.

■ We need not define in this case precisely what level of individualized suspicion is required in the context of prison visitor searches. The question before the court is not whether the proper standard should be reasonable suspicion or should rise to the level of probable cause, but whether a constitutional right to be free from strip and body cavity search absent probable clause was clearly established at the time of the searches for purposes of qualified immunity. We hold that such a right was not established.

In the Sixth Cicuit, we have not stated what level of fourth amendment protection is clearly established in the context of prison visitor searches. In *Ohio Civil Service Employees Ass'n. v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988), the Court held that the level of protection against strip and body searches afforded to prison employees was not clearly established. In dicta, the Court discussed the precedents from other circuits holding that strip searches of prison

visitors without a "reasonable suspicion" could violate the fourth amendment. *See, e.g., Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982); *Blackburn v. Snow,* 771 F.2d 556 (1st Cir.1985); *Thorne v. Jones,* 765 F.2d 1270 (5th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1986). The *Seiter* Court distinguished the reasoning for cases involving searches of prison visitors from cases, like the one before it, involving strip searches of prison employees. 858 F.2d at 1176–77. The Court held that the state had a higher interest in searching prison employees than in searching prison visitors. *Id.* at 1177. The Court noted that prison employees had access to more sensitive areas of the prison than did visitors and that prison employees spent more time in the prison than did visitors. *Id.* In addition, the Court stated that prison employees had less of a privacy interest than did prison visitors because the employees had volunteered to work in a security environment. *Id.*

Unlike searches of prison employees, searches of prison visitors during 1984 and 1985 without at least a reasonable suspicion violated clearly established law, because a reasonable officer should have known that such searches would be found unconstitutional. As noted by the court in *Seiter,* while prison visitors volunteer to visit the prison, they probably do not choose to incarcerate their friends or family members. *Id.* The prison visitors' situation is analogous to that of air travellers going through airport security. Although they volunteer to board the airplane, they do not lose their right not to be subjected to something so invasive as a strip or body cavity search without so much as a hint of suspicion. *See Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982) (strip searches are inevitably "embarrassing and humiliating"). However, the plaintiffs have not alleged that this clearly established fourth amendment right was violated. The plaintiffs have alleged only that the wardens lacked *probable cause* for their searches, not that the wardens lacked reasonable suspicion. The asserted right of prison visitors to be free from strip and body

cavity searches without probable cause was not clearly established under the fourth amendment. Consequently, the plaintiffs have failed to plead a cause of action under the fourth amendment that can ovecome the wardens' assertion of qualified immunity.

## II. *Liberty Interest*

Tennessee prison regulations give inmates liberty interest in prison visitation under the fourteenth amendment to the federal Constitution, which the wardens have clearly violated according to plaintiffs' allegations. As we have stated, "The Supreme Court has determined that violation of a clearly established state regulation is sufficient to cause officials to forfeit their qualified immunity" for claims of deprivation of federal constitutional guarantees. *Spruytte v. Walters,* 753 F.2d 498, 510 (6th Cir.1985), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 767 (1986); *see Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). In *Spruytte,* we found that a state regulation, which allowed inmates to receive books that did not threaten security, created a constitutionally protected property or liberty interest. Because the state regulation was clearly established, the panel in *Spruytte* held that prison officials were not entitled to qualified immunity where they refused to allow an inmate to receive a paperback dictionary from his mother.

Even before *Spruytte,* we recognized that other Tennessee prison regulations created liberty entitlements for inmates under the fourteenth amendment to the federal Constitution. *Bills v. Henderson,* 631 F.2d 1287, 1294 (6th Cir.1980). In *Bills,* Tennessee prison inmates challenged prison officials' use of administrative segregation in violation of Tennessee prison regulations. We held that a state prison policy statement created a federal constitutionally protected liberty interest if it limited the discretion of prison officials. *Id.* at 1293–94. We also found that official discretion was limited enough to create a protected liberty interest by regulations, which mere-

ly stated the purposes of administrative segregation. *Id.* at 1294.

In *Kentucky Dep't. of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989), the Court held that state prison regulations must be couched in mandatory language in order to establish a liberty interest with federal constitutional due process protection. The Court held that the Kentucky regulations at issue in *Thompson* were not sufficiently mandatory to invoke a property interest. The Kentucky regulations merely stated, "It is the policy of the Kentucky state reformatory to respect the right of inmates to have visits in the spirit of the court decisions and the consent decree, while ensuring the safety and security of the institution." In stark contrast, the Tennessee prison regulations clearly state in mandatory terms that a strip search can not take place without probable cause. Tenn. Dep't. of Correction Policy No. 506.06, V.B. The same regulations explicitly define probable cause as "more than mere suspicion." *Id.* at No. 506.06, IV.I.

█ Tennessee prison regulations establish the inmates' fourteenth amendment liberty interest in visitation under the reasoning in both *Bills,* 631 F.2d 1287, and the later, stricter requirements of *Thompson,* 490 U.S. 454, 109 S.Ct. 1904.[4] The Tennessee prison regulations state that inmates "shall" have visitation rights and that visits "shall be limited only by the institution's space and personnel resources." *Id.* at No. 507.01, V.B. The Tennessee prison regulations require the warden to establish a visitation schedule "which includes at least the hours of one evening per week, Saturdays, Sundays and state holidays." Tenn. Dep't. of Corrections Policy No. 507.01, VI.C.[5] In addition, the Tennessee regula-

tions allow visitation rights to be suspended only upon a showing of "good cause." Tenn. Dep't. of Corrections Policy No. 507.-01, VI, Procedures, § E(5); *cf. Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982) ("The hallmark of property, . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause' "). Because the plaintiffs' visitation rights were mandatory and could not be removed without good cause under the Tennessee prison regulations, they were liberty entitlements under the fourteenth amendment. Threats to remove this visitation right, in retaliation for the visitors' refusal to submit to an illegal strip search, violated clearly established law. Thus, qualified immunity does not bar plaintiffs' action for this alleged constitutional deprivation.

The wardens rely on *Washington v. Starke,* 855 F.2d 346 (6th Cir.1988), to argue that an intra-departmental regulation cannot provide a basis for denying qualified immunity. This argument misconstrues *Starke. Starke* concerned a single police department, as opposed to a statewide prison system. Thus, *Starke* does not alter either the Supreme Court's decision in *Thompson* or our decisions in *Bills* and *Masters v. Crouch,* 872 F.2d 1248 (6th Cir. 1989).

Once a constitutional liberty interest is clearly established, prison officials may violate that interest only if they meet the fundamental requirements of due process—notice and an opportunity to be heard. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Plaintiffs have alleged that they were not afforded any process at all. The district court properly denied the

4. Although *Thompson* was not decided until 1989, applying it here does not violate the rule that public officials are accountable only for laws that were clearly established at the time of their actions. *Washington v. Starke,* 855 F.2d 346, 348 (6th Cir.1988). The Court's decision in *Thompson* reflected the state of clearly established law in 1985—the time of the visitation in that case. The searches in this case occurred during that same period. Thus, *Thompson* is good precedent concerning the state of the four-

teenth amendment during the relevant time in this case. In any event, if *Thompson* did not apply, we would analyze this issue under the less stringent requirements set forth in *Bills.*

5. The imprecise language regarding the visitation schedule presumably allows inmates to have one visitation night during the normal workweek and additional visitation on weekends and state holidays.

wardens' claim of qualified immunity in regard to the plaintiffs' claims of deprivation of liberty without due process under the fourteenth amendment.

### III. *Freedom of Association Rights*

██ The district court also held that plaintiffs' first amendment rights of free association were violated by the wardens' refusal, without probable cause, to allow visiting plaintiffs to visit the inmate plaintiffs unless the visitors submitted to a strip or body cavity search. A prison inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Although the complaints are not clear and the briefs do not address this issue, plaintiffs apparently allege that the searches violated the plaintiffs' freedom of association by discouraging visits to the inmates. Plaintiffs do not allege any intent to discourage association, either for its own sake or as retaliation for any actions by the inmates in prison. In the Sixth Circuit, we have not decided the degree to which prison inmates retain their freedom of association. The Fifth Circuit has held that prison inmates have no first amendment right "to simple physical association." *Thorne v. Jones,* 765 F.2d 1270, 1274 (5th Cir.1985). Given the sparse authority on this issue, we hold that any such right, if it exists, is not clearly established. Consequently, we reverse the district court's ruling on this issue.

For the above stated reasons, we reverse the judgment of the district court insofar as we find that qualified immunity should be granted to the wardens in regard to the plaintiffs' claims under the fourth and first amendments, and we affirm the district court's judgment denying the wardens' qualified immunity against claims alleging violations of the due process clause of the fourteenth amendment.

BOGGS, Circuit Judge, concurring in part and dissenting in part.

If we are to deny qualified immunity to these prison officials based on their viola-tion, not of the Constitution directly, but of state administrative regulations, we must find that, in 1985, all reasonable prison officials would have known that they could be personally liable for money damages if they violated a prison regulation of their own state. *McIntosh v. Weinberger,* 810 F.2d 1411, 1433 n. 9 (8th Cir.1987); *Dominique v. Telb,* 831 F.2d 673, 676 (6th Cir. 1987).

I do not think that the state of the case law permits that conclusion. The best case for that proposition is *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Although that case is not a model of clarity, footnote 12 (468 U.S. at 194, 104 S.Ct. at 3019) while clearly discounting mere violation of a regulation as the basis for any kind of liability, seems to say that a section 1983 suit sometimes can be based on a violation of a regulation that furnishes the gravamen of the action sued on, though at other times it speaks of liability "only to the extent that there is a clear violation of the *statutory* rights...." (emphasis added). Although the violation of the regulation led directly to and authorized the strip search that is the injury complained of, I do not think all reasonable officials would understand from *Davis* that they were now liable in damages for every violation of regulations. Similarly, *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), which holds that a prison regulation can be the basis for a liberty interest protected by section 1983, was not a money damages case and does not allude to that possibility.

I therefore respectfully dissent from that portion of the opinion that refuses to allow qualified immunity from suit based on violation of the prison regulation.