Tina **SPEAR**, Plaintiff–Appellant,

v.

Dewey **SOWDERS**, et al., Defendants–Appellees.

No. 93–5528.

United States Court of Appeals, Sixth Circuit.

Argued March 17, 1994.

Decided Aug. 25, 1994.

Order Granting Rehearing En Banc Nov. 8, 1994.

---

David A. Friedman, American Civil Liberties Union of Kentucky, Louisville, KY (argued and briefed), for plaintiff-appellant.

John T. Damron, Office of Gen. Counsel Corrections Cabinet, Frankfort, KY (argued and briefed), for defendants-appellees.

Before: JONES, BOGGS and DAUGHTREY, Circuit Judges.

The court delivered a PER CURIAM opinion. BOGGS, Circuit Judge (pp. 583–84), delivered a separate opinion concurring in part and dissenting in part.

PER CURIAM.

Plaintiff-Appellant Tina Spear filed this 42 U.S.C. § 1983 action for damages alleging that the defendants-appellees, Kentucky prison officials, violated her constitutional rights by subjecting her to a strip and body cavity search, as well as by searching her car, when she visited an inmate. The court granted summary judgment to the defendants, holding that they had qualified immunity from suit. We reverse the district court and remand for trial.

## I

On Christmas Day, 1990, Tina Spear went to the Northpoint Training Center ("NTC"), a Kentucky prison, to visit her boyfriend, Daniel Wade. Upon her arrival, she was informed that she would not be permitted to visit unless she submitted to a strip and body cavity search and a search of her clothing, purse, pocketbook and car. Spear alleges that NTC officials advised her that if she did not consent to the searches, she would be detained while an arrest warrant was obtained, and that she would thereafter be barred from NTC. Wishing to see Wade on the holiday, she consented to the search.

An NTC nurse conducted the strip and body cavity search with another officer present. They had her remove her clothing and then visually inspected her body, including her vagina and her anus, and they further searched both those body cavities by inserting their fingers. NTC officials also searched Spear's clothing, purse, and pocketbook, as well as her car. Spear claims to have been embarrassed, humiliated, and demeaned by the search. None of these searches revealed the presence of any contraband, and Spear proceeded to visit Wade.

Spear claims that she has never possessed contraband at NTC, has never attempted to introduce contraband there, and has never given prison officials any cause to believe that she would attempt to introduce contraband. Also, she states that she has no criminal record of any kind. In their answers to interrogatories, the defendants state that the search was ordered because a reliable confidential informant in the prison told an officer that Wade was receiving drugs every time a young unrelated female visited him, and prison records showed that Spear was the only unrelated visitor Wade had received in 1990.

The defendants filed a motion to dismiss this action on the ground that they are entitled to qualified immunity. In ruling on the motion, the district court treated it as a motion for summary judgment under Federal Rule of Civil Procedure 56, since the parties referred to matters outside the pleadings. *See* Fed.R.Civ.P. 12(b) (requiring such treatment). The district court acknowledged that Spear had a clearly established constitutional right not to be strip-searched unless the officials had reasonable suspicion that she was attempting to smuggle contraband into the prison. However, the court found that based on Wade's history of prior drug activity in prison and based upon the tip from the confidential informant, the defendants did in fact have "reasonable suspicion to target the Plaintiff for a strip search and that Plaintiff's constitutional rights were not violated by this strip and body cavity search." J.A. at 80. Consequently, the court concluded the defendants were entitled to qualified immunity.

## II

"[A] strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience." *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982). Nevertheless, the Fourth Amendment allows such searches in certain circumstances. *See Bell v. Wolfish*, 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979) (approving policy requiring body cavity searches of prison inmates after contact with visitors). Circumstances permitting the searches of automobiles occur with more frequency. On the facts alleged by the plaintiff and disclosed through the answers to interrogatories, we hold that both the strip search and the car search here were unconstitutional and that their unconstitutionality was clearly established at the time of the

search, precluding the qualified immunity defense.

### A

■■■ Government officials who perform discretionary functions generally are shielded from personal liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982). The central purpose of affording public officials qualified immunity from suit is to protect them "from undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806, 102 S.Ct. at 2732. In this circuit, a finding of a clearly established constitutional right generally must be supported by precedent from the Supreme Court or this circuit, or, in the alternative, by decisions from other circuits or by the highest court in the state where the case arose. *Poe v. Haydon,* 853 F.2d 418, 424 (6th Cir.1988).

■ For a right to be clearly established: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citation omitted).

■ Thus, the ultimate issue before us is not merely whether the Defendants actually violated Spear's constitutional rights. Rather, the issue is whether those rights were clearly established when the officials performed the search. Whether qualified immunity applies in a particular case is a matter of law, and as such we review *de novo* the district court's analysis. *Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994); *Long v. Norris,* 929 F.2d

1111, 1114 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991).

### B

■ Although the Fourth Amendment usually requires officials to have probable cause and to obtain a search warrant before performing a search, courts have defined a number of exceptions to these requirements, under which government officials may perform a search without a warrant and with less than probable cause. In developing a "prison visitor" exception to the warrant requirement, this circuit and others have applied the "reasonable suspicion" standard developed in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to official searches of citizens who are visiting inmates.

■ In the early to mid–1980s, three circuit courts explicitly held that a reasonable suspicion standard governs searches of prison visitors. *See Blackburn v. Snow,* 771 F.2d 556, 564–66 (1st Cir.1985); *Thorne v. Jones,* 765 F.2d 1270, 1277 (5th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1986); *Hunter,* 672 F.2d at 674.[1] Due to these cases, this circuit recognized in *dicta* that by 1985 it was clearly established in this circuit that reasonable suspicion is necessary to search a visitor. *Long,* 929 F.2d at 1116. We then expressly held that by 1988, "the case law clearly established the contours of the prison visitor's right to be free from a visual body cavity search in the absence of reasonable suspicion that he or she is carrying contraband." *Daugherty v. Campbell,* 935 F.2d 780, 787 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). These cases recognize that citizens do not lose the protection of the Fourth Amendment when they visit prison, but that their protection is reduced because they have a reduced expectation of privacy and because the government has a strong interest in stopping the entry of illegal drugs and other contraband. *See, e.g., id.* at 786; *Blackburn,* 771 F.2d at 567–68. The fact that a prison visitor has consented to the search upon prompting from officials

---

1. Before these cases, one district court had established that prison officials need "real suspicion"

in order to search a visitor. *Black v. Amico,* 387 F.Supp. 88, 91 (W.D.N.Y.1974).

does not eliminate the reasonable suspicion requirement. *See Long,* 929 F.2d at 1116 (comparing a prison visitor to a person going through airport security); *Blackburn,* 771 F.2d at 562–63. Thus, there can be no dispute that at the time of this search in December 1990, the law was clearly established that officials needed reasonable suspicion in order to search Spear.

 Ever since it first articulated the reasonable suspicion standard, the Supreme Court has made clear that "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry,* 392 U.S. at 18, 88 S.Ct. at 1878. "The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Id.* at 19, 88 S.Ct. at 1878 (quotations omitted). As the Court has rephrased this requirement from *Terry:*

> Determining the reasonableness of any search involves a twofold inquiry: first, one must consider whether the action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place.

*New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985) (citations and quotations omitted).

It therefore has been clearly established that reasonable suspicion must support the scope of a search as well as the initiation of it. In the context of searches of the person, it is obvious that searches are more intrusive in their scope the more they encroach upon a person's body, *i.e.* that a nude search is greater in scope than a pat-down search with the subject's clothing remaining on. As the First Circuit has described the levels of nude body searches:

A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Blackburn,* 771 F.2d at 561 n. 3; *cf. Bell,* 441 U.S. at 558 n. 39, 99 S.Ct. at 1884 n. 39 (emphasizing that search of prisoner was a visual one but not a manual one). It should be clear to any prison officials that progressively more intrusive searches demand a higher level of suspicion, or particularized suspicion to warrant the search of the particular area or body cavity. *See T.L.O.,* 469 U.S. at 347, 105 S.Ct. at 745–46 (discovery of rolling papers gave rise to suspicion to search student's purse for marijuana; discovery of further drug paraphernalia then made it reasonable to search a zippered compartment of purse).

### C

 In this case, when the warden authorized the search of Spear, he filled out a form indicating his justification for doing so. His sole written justification was that a confidential informant informed a prison guard that inmate Wade "was receiving drugs every time a young unrelated female visited." J.A. at 61. Since prison records for the year indicated that Spear had been the only non-related visitor that year, the warden authorized her to be searched on her next visit.[2] Spear had not visited the prison during the eight weeks preceding the informant's October 3, 1990, statement to the guard. J.A. at 40.

 The first question we address is whether the informant's statement gave the

---

**2.** In their submissions in this action, the defendants also imply that the fact that Wade had been guilty of previous drug infractions while in prison casts suspicion upon Spear. Sowders Br. at 2. However, this claim is deceptive. Wade had only one drug offense in 1990, and that was for possession of four pills of the prescription drug Darvocet, a pain killer. Upon investigation within the prison, it was determined that a prison dentist prescribed Wade the pills two days before he was found with them, so it was apparent the pills were not smuggled from outside the prison. J.A. at 52. Prison searches had found Wade with small amounts of marijuana on four occasions between February 1987 and March 1989, but the prison had no record of any visit by Spear before 1990. Thus, apart from the statement that the warden relied upon, there was absolutely no evidence even implicitly connecting Spear with any drugs ever found in Wade's possession, and in fact he had not been found with illegal drugs during the prior year and nine months.

prison officials reasonable suspicion to initiate a strip search of Spear. We find that there was simply not enough information indicating that Spear was carrying drugs to subject her to such an invasive search. The informant's identification of a "young unrelated female" was remarkably vague, and it was supported by no other evidence that Wade had possessed illegal drugs at any time subsequent to any visit by Spear. As there was not reasonable suspicion, the officials violated the Fourth Amendment in initiating the search. Moreover, because the facts casting suspicion upon Spear were so meager, it should have been apparent to the officials that they did not have reasonable suspicion to initiate the search.

■ Second, we consider the scope of the search. It is absolutely clear that the officials did not have enough suspicion to subject Spear to a visual body cavity search, or to a manual body cavity search, both of which they performed. Given the information available, a reasonable person could not have concluded that there was a reasonable probability that contraband would be found in her body cavities, so qualified immunity does not apply. Even Northpoint's own regulations required particularized reasonable suspicion for searches of the anal cavity.[3]

■ Third, in determining whether an official had reasonable suspicion to perform a search, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). An evaluation of the totality of the circumstances, looked at in the light most favorable to Spear, makes it even more apparent that the strip-search was unreasonable. In his response to interrogatories, the warden stated that all inmates are strip-searched at the conclusion of their session with visitors. J.A. at 22; *see* J.A. at 33 (prison regulations requiring inmates to be strip-searched after visits). This fact alone

vastly reduces the necessity to invade the privacy of a visitor, and it correspondingly narrows the circumstances in which it is reasonable to subject a visitor to a strip search. Additionally, the prison regulations state that during the visit the inmate sits facing a prison officer. *Id.* at 33. The prisoner and the visitor are allowed no more contact than holding hands, though they may kiss and embrace briefly at the beginning and end of the visit. *Id.* At this stage in the litigation, we do not know whether the prison adheres to its regulations, nor what other precautions against smuggling it takes. *See Hunter,* 672 F.2d at 676 (discussing use of solid partitions under visiting tables and screens above tables). However, these circumstances, looked at in the light most favorable to Spear, make the transfer of illegal contraband so difficult that any type of strip search of a visitor is unreasonable without a reasonable probability that she is able to evade the protections.

■ Finally, it is absolutely clear that the officials did not have reasonable suspicion to search Spear's car. Even if there was some reason to believe contraband had been hidden in her car, it was obviously not being transported to Wade and therefore was not properly targeted by the prison visitor exception to the warrant requirement. Such an automobile search is part of an ordinary criminal investigation and requires either a warrant based upon probable cause or the application of an exception to the warrant requirement. *See Marriott v. Smith,* 931 F.2d 517, 521 (8th Cir.1991) (finding no qualified immunity where officials unconstitutionally searched prison visitor who was leaving the prison and thus could not then be bringing contraband to the inmates).

### III

For the above stated reasons, we REVERSE the district court, and remand for a trial or other proceedings below.

---

**3.** "The anal cavity shall not be visually inspected unless there shall be reasonable suspicion that contraband is being carried in the anal cavity." J.A. at 26 (Northpoint Reg. No. NTC 09–06–01). In *Long,* 929 F.2d at 1116–18, we held that qualified immunity did not bar a suit against officials who violated prison regulations stating that a strip search cannot take place without probable cause, for the regulations created a clearly established liberty interest. Plaintiffs do not predicate their suit on the Northpoint regulations, so we need not decide if *Long*'s rule applies here.

## I

BOGGS, Circuit Judge, concurring in part and dissenting in part.

I concur in the decision of the court that it was inappropriate for the district court to have granted summary judgment on the basis of qualified immunity. However, I do so on a more limited basis than that contained in the court's opinion, and I set forth my disagreement with a considerable portion of the court's opinion.

In my view, the clearly established rights that the defendants may have violated, taking the view of the facts most favorable to the plaintiff, are the right not to be detained without probable cause, and the right not to be searched for administrative reasons without being given a chance to refuse the search and depart.

Because of the need for prison security, visitors do not have the right of unimpeded access to prisoners under the same circumstances that they would have unimpeded access, without government scrutiny, in society outside the prison. *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); *Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984). However, just as with the special circumstances that justify an electronic search by a metal detector at an airport, *see, e.g., United States v. Davis,* 482 F.2d 893 (9th Cir.1973), the government's power to intrude depends on the fact that the person insists on access. There is no authority that prison officials, relying on their special powers, may search a visitor who objects, without giving the visitor the chance to abort the visit and depart. Here, prison officials detained Ms. Spear without probable cause and told her that she would not be permitted to depart without being searched. Under these circumstances, the consent was coerced, and could not operate to justify the search. Similarly, the search of Spear's car was also based on a coerced consent.

## II

The court's opinion, however, goes far beyond this aspect of the search, to lay down novel and far-reaching principles governing the relationship between prison officials and visitors to the prison. The fundamental question involved here is what is "reasonable suspicion" of the carrying of contraband, in a prison visitor setting. *Daugherty v. Campbell,* 935 F.2d 780 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992).[1] The more important issue, however, is the court's holding that it "has been clearly established that reasonable suspicion must support the scope of a search as well as the initiation of it." While it is certainly true that progressively more intrusive searches are more distressing to those searched, and that the full body-cavity search involved here may indeed, as Spear states, have been "embarrass[ing], humiliat[ing], and demean[ing]," there is no law prior to this case that a person as to whom there is a reasonable suspicion of criminal conduct has a clearly established right to contact visits with a prisoner without paying such a price.

The court's reading of the facts here is exceptionally narrow, and is more analogous to application of the preponderance of the evidence or probable cause standard, not the standard of reasonable suspicion. The facts as known to the prison officials were that a previously reliable tipster indicated that Spear's boyfriend, the prisoner Daniel Wade, was obtaining drugs every time an unrelated female visited him. Spear was the only unrelated person to visit Wade in the previous year. The prison officials knew that Wade had had a number of drug-related infractions while in the prison. On its face, it is very difficult to understand how this could not be considered reasonable suspicion.

The court appears, however, to weigh against this information other information that does, to some extent, detract from its weight. Essentially, the opposing information is that there was no record that Wade had ever been caught with drugs shortly after one of Spear's visits, except on one occasion when there was reason to believe that the drugs with which he had been

---

1. In some cases, a prison may not search a prisoner or visitor without probable cause. This higher standard, however, is not constitutionally mandated, but is the result of prison regulations to that effect. *See, e.g., Daugherty v. Campbell,* *supra,* and *Long v. Norris,* 929 F.2d 1111 (6th Cir.1991). Such regulations are binding on the state and establish a liberty interest of the visitors.

caught had a source inside the prison. While this information would certainly be relevant to a decision-maker, it strains credulity to believe that suspicion in a prison setting would vanish based on an assumption that prison procedures for detecting drugs are so perfectly efficient that we must assume that a prisoner does not have drugs except at the moment he is caught with them.

Second, the court lays down a new standard of "progressive suspicion" and holds that such a standard was also clearly established in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). This seems contrary to all logic: A person attempting to smuggle contraband is likely to hide it in a location more difficult, rather than a less difficult, to detect. *But cf.* Poe, *The Purloined Letter.* The analogy to *T.L.O.* is of very little relevance here. While a "progressive search philosophy" may be necessary in the school context, the circumstances that render a search of a visitor necessary are more exigent in the prison setting. As the Supreme Court has pointed out, the "unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country," *Block v. Rutherford,* 468 U.S. 576, 588–89, 104 S.Ct. 3227, 3234, 82 L.Ed.2d 438, and that "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884. For these reasons, the Court has consistently "[struck] the balance in favor of institutional security," *Hudson,* 468 U.S. at 527, 104 S.Ct. at 3201, 82 L.Ed.2d 393 (1984), and accorded great weight to the "professional expertise of corrections officials." *Bell,* 441 U.S. at 548, 99 S.Ct. at 1879 (quotations marks and citation omitted). Given these particularized circumstances, visitors possess a "diminished expectation of privacy" when they enter a correctional facility. *Blackburn v. Snow,* 771 F.2d 556, 565 (1st Cir.1985). Here, however, the court's opinion gives particular added comfort to smugglers in that it means that if they leave no clues in the obvious places, they have additional security that less obvious places cannot be searched.

Finally, the court places a great deal of its confidence in other prison security measures.

It specifically states that the search of prisoners after a session "alone vastly reduces the necessity to invade the privacy of a visitor." The court is further comforted by the attendance, required by regulations, of a presumably ever-vigilant prison officer while the prisoner and visitor are allowed "no more contact than holding hands, though they may kiss and embrace briefly at the beginning and end of the visit." This is a remarkably sanguine view of a factual situation taking place under difficult conditions, a long way from a federal appellate courthouse.[2] I do not see the slightest indication in the case law that this view of penal administration had been "clearly established" at any time. It, of course, raises the further anomalies that prison authorities under our jurisdiction may be impelled to end contact visits. Alternatively, they might decide that the interests of prison security would be better served by relaxing internal controls to a point satisfactory to federal judges, in order to maintain their ability to search visitors. This type of judicial second-guessing of prison administration in matters of security is exactly what the Supreme Court has repeatedly warned against. *Bell,* 441 U.S. at 548, 99 S.Ct. at 1879. I therefore concur in remand for further proceedings, but respectfully dissent from the reasons given by the court for the remand.

## ORDER

### Nov. 8, 1994

A judge of this court requested a poll which resulted in a majority of the judges of this court voting for rehearing of this case en banc.

Accordingly, the case will be scheduled for reargument before the en banc court at the earliest practicable date. The clerk will direct the parties to file supplemental brief.

**2.** For a recent example of jail smuggling activities in our circuit, *see* Michael Quinlan, *A National Problem: Despite Efforts to Combat it, Smuggling is Common in Jails,* Louisville Courier-Journal, Aug. 5, 1994, pp. A1, A6, A7.