**Marvin R. ANTHONY, Sr. Administrator of Estate of Gregory D. Anthony; Deceased, Plaintiff,**

v.

**Chase VACCARO, et al., Defendants.**

No. 4:98CV1567.

United States District Court,
N.D. Ohio,
Eastern Division.

March 16, 1999.

Michael L. Nelson, Sr., Earle C. Horton, Graves & Horton, Cleveland, OH, for Marvin R. Anthony, Sr.

S. Randall Weltman, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, OH, Thomas J. Wilson, Comstock, Springer & Wilson, Youngstown, OH, for Chase Vaccaro.

Thomas J. Wilson, Comstock, Springer & Wilson, Youngstown, OH, for Joseph Robert Marhulik, Albert J. Timko, Jr., R.W. Thomas.

Thomas J. Wilson, Comstock, Springer & Wilson, Youngstown, OH, James E. Sanders, City of Warren, Dept. of Law, Warren, OH, for City of Warren.

Daniel P. Thomas, Delbene, Lapolla & Thomas, Warren, OH, Gary A. Piper, Baran, Piper, Tarkowsky, Fitzgerald & Theis, Mansfield, OH, for Fred H. Raines, Trumbull County Metropolitan Housing Authority.

John Thomas McLandrich, Mazanec, Raskin & Rider, Solon, OH, for Thomas J. Rush, Warren Township.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This matter is before the Court upon the Motion for Summary Judgment based on qualified immunity by Defendants, Chase Vaccaro, Joseph R. Marhulik, Albert J. Timko, R.W. Thomas, Jr., and the City of Warren (Dkt.# 19). Plaintiff filed a Motion in Opposition to Defendants' Motion for Summary Judgment (Dkt.# 23). No Reply brief was filed.

Counts One and Two of the Complaint allege that Vaccaro violated Decedent's Fourth and Fourteenth Amendment (substantive due process) rights, when he fatally shot the decedent in the neck during an arrest. Count Six alleges a conspiracy by Marhulik, Timko, and Thomas to conceal said constitutional violations. In this 42 U.S.C. § 1983 action, Defendants are sued in their official and individual capacities.

■ Section 1983 provides a cause of action against any person, who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law. 42 U.S.C. § 1983. However, when officials are sued in their *individual* capacities[1], they may be protected from liability for damages if their alleged wrongful conduct was committed while they performed a function protected by qualified immunity. *See Cagle v. Gilley,* 957 F.2d 1347, 1348 (6th Cir.1992).

■ Government officials are generally entitled to qualified immunity when performing discretionary functions as long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, "in the light of pre-existing law the unlawfulness must be apparent." *Id.*

■ "The first step in a qualified immunity analysis is whether, based on the applicable law, a constitutional violation occurred." *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 589 (6th Cir.), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994); *Silver v. Franklin Township,* 966 F.2d 1031, 1035 (6th Cir. 1992). To prove that a right was clearly established, a claimant can draw from either Supreme Court precedent, precedent from this court, or cases from other courts which "point unmistakably to the unconstitutionality of the conduct and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Mumford v. Zieba,* 4 F.3d 429, 432–33 (6th Cir.1993).

■ The Court utilizes an "objective reasonableness" standard to determine whether a government official would believe that a right is clearly established. *Long v. Norris,* 929 F.2d 1111, 1115 (6th Cir.1991). "[T]he objective reasonableness test focuses on whether an official, given the facts that the official knew or reasonably should have known about the situation, should have known that his or her particular conduct would not pass scrutiny when applied to the law." *Id.* (citations omitted).

■ Individual claims of immunity must be analyzed on a fact-specific, case-by-case basis to determine whether the constitutional rights were so clearly established when the alleged misconduct was committed that any official in the defendant's position would understand that what they were doing violates those rights. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Once disputed factual issues are resolved, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817 (2d. Cir.1990).

Furthermore, as Defendants assert qualified immunity in the context of Fed. R.Civ.P. 56, the facts are to be construed in the light most favorable to Plaintiff. *Poe v. Haydon,* 853 F.2d 418, 426 (6th Cir.1988) ( [S]ummary judgment would not be appropriate if there is a factual dispute

---

1. "Qualified immunity does not apply to a political subdivision." *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). *See also Garner v. Memphis Police Dept.,* 710 F.2d 240 (6th Cir.1983).

A political subdivision is defined as a municipal corporation, township, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of a state. Ohio Rev.Code Ann. § 2744.01(F).

Therefore, the City of Warren may not seek summary judgment on the basis of qualified immunity.

(*i.e.* a genuine issue of material fact) involving an issue on which the question of immunity turns, such that before trial whether the defendant did acts that violate clearly established rights).

*1. Vaccaro*

■ The relevant portion of Vaccaro's account of the events of the July 11, 1997 are as follows:

4. On July 11, 1997, I was working in the undercover van detail with my supervisor, Sgt. Joseph Marhulik, Patrolman Joseph O'Grady, and Trumbull County Metropolitan Housing Authority security manager, Fred Raines. I heard information over the radio from a dispatcher that multiple robberies had occurred in the area. A description was given regarding the vehicles and suspects allegedly involved. I assumed the suspects were armed and dangerous, since the robberies involved the suspects removing the cash register from the places of business being robbed. At approximately 11:00 p.m., we heard another call from dispatch in regard to another robbery inside the City of Warren at the North Leavitt Road Dairy Mart. fleeing that we were on the west side of the city, we decided to travel in that direction in an attempt to locate the suspect vehicle. During the ride, I heard a township officer advise that he had the suspect vehicle spotted. We drove to that location, within the Warren Township Police Department's jurisdiction and observed a Warren Township cruiser behind the suspect vehicle in what appeared to be a traffic stop Moreover, I observed a Warren Township officer with a subject on the ground, and that officer informed us that another subject took off running and that his partner was in pursuit. Mr. Raines and I ran across the street to assist the township officer in pursuit of the other suspect. After crossing the street, I observed the suspect heading towards a wooded area that was very dark. I started to pursue the suspect and drew my weapon as I assumed he was armed. I was unfamiliar with the location and the area was dark and secluded. I also did not see the Warren Township police officer, which caused me concern. I had my weapon in a down, ready position.

5. As I continued to pursue the fleeing suspect, I retrieved my mini flashlight and I was able to observe the suspect running. I yelled out to the suspect to stop, and I identified myself as a police officer. I also advised the suspect to get on the ground. The suspect, who was later identified as Gregory D. Anthony, ignored my commands and continued to flee. I then observed him go to the ground and I slowly approached him. As I approached Mr. Anthony, I continued to use my flashlight and I observed him making furtive movements to and from his waistline, as he placed objects next to him on his left side. Again, as I approached, I yelled "police, don't move". I then glanced down at the ground briefly and observed money and what I thought, and appeared to be, a gun lying within Mr. Anthony's reach on his left side. Upon seeing the gun, I decided to get closer to the suspect in order to handcuff him. As I approached, I moved my weapon to the target ready position.

6. As I got closer to Mr. Anthony, I realized that this was a large suspect, and someone who easily outweighed and outsized me. This caused me further concern for my safety, especially in light of the fact that I thought he had a gun within his reach and he continued to ignore my commands I placed my knee on his back in order to gain control of his movement, but the suspect was making quick movements and I again issued a warning to him not to move. I determined that the suspect was not holding a weapon in his hands and I returned my flashlight to my holder in an attempt to proceed with handcuffing him.

7. Despite my continued attempts to control Mr. Anthony and my warnings

to him he continued to engage in movement and fight me, which caused me to believe that he was an immediate threat to my safety. Because of his refusal to follow my instructions, I could not secure Mr. Anthony and I concluded that it was not safe for me to attempt to place him in handcuffs at that time. I decided to call for back up and get assistance, and as I made the movement to retrieve my portable radio, Mr. Anthony once again disobeyed my repeated commands and his left arm reached back and came forward at which time I believed he was reaching for the weapon on the ground. I then moved my finger to the trigger of my weapon, and Mr. Anthony quickly and violently jerked his right shoulder upwards, causing my weapon to discharge.

Vaccaro Aff. at ¶¶ 4–9.

Although Vaccaro characterizes the shooting as accidental, this Court concludes that there are questions of fact with regard to the circumstances surrounding the shooting. Vaccaro states that "[Decedent's] left arm reached back and came forward" and that "[Decedent] quickly and violently jerked his right shoulder upwards" which caused his gun to discharge. (Vaccaro Aff. at ¶ 7.) However, the Autopsy Report showed no signs of stippling or gunpowder residue. Report of Autopsy No. T–68–97, p. 2. Additionally, the Autopsy Report states that "there is no evidence that this wound constitutes a contact, near contact or intermediary range wound."

The Sixth Circuit addressed a similar question where there was conflicting evidence in *Bunch v. Village of New Lebanon*, 57 F.3d 1069, 1995 WL 329260 (6th Cir. May 31, 1995). Plaintiff sued the village individually and as Administratrix of the Estate of Aaron Matthew Bravard, her son. Bravard was shot and killed by a

police officer during an arrest. The *Bunch* court stated, "[H]ere there is physical evidence calling into question the accuracy of the officer's explanation of what transpired." *Id.* 1995 WL 329260 at *2. The same is true in the case *sub judice*.

As this Court cannot determine the first prong of the qualified immunity analysis, that is, whether a constitutional violation has occurred[2], Vaccaro's motion for summary judgment on the basis of qualified immunity is denied.

### 2. *Marhulik, Timko, and Thomas*

 Count Six alleges a conspiracy among Marhulik, Timko and Thomas to "cover up and legitimize" the fatal shooting by failing "to investigate Vaccaro's actions or seek evidence unfavorable to Vaccaro." Complaint at ¶ 44.

 "[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107, (1988). "In order to find supervisory personnel liable under § 1983, the plaintiff must allege that the supervisors condoned, encouraged, or knowingly acquiesced in the alleged misconduct." *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir.1993).

The Sixth Circuit has also held that "a failure to investigate may give rise to section 1983 supervisory liability." *Walker v. Norris*, 917 F.2d 1449 (6th Cir.1990) *citing Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), *cert. denied* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987). However, the reasoning in *Walker* and the analysis in its progeny indicate to this Court that evidence of the "failure to investigate" can only establish municipal liability.

*Pontiac*, 41 F.3d 1061 (6th Cir.1994) ("Gross negligence is not actionable under § 1983, because it is not 'arbitrary in the constitutional sense.' ")

2. In order to establish a Fourth Amendment violation or a violation of substantive due process under the Fourteenth Amendment, Plaintiff must establish that Vaccaro intentionally shot the decedent. *Gazette v. City of*

In *Dyer v. Casey,* 72 F.3d 129, 1995 WL 712765 (6th Cir. Dec.4,1995), the Court stated that "the theory underlying [*Marchese, Lucas,* and *Gutierrez* (citations omitted) ] is that the *municipality's* failure to investigate or discipline amounts to a 'ratification' of the officer's conduct" (emphasis added).

Furthermore, in *Walker, supra,* the Sixth Circuit distinguished *Marchese* because "there was, in fact, no serious investigation conducted by any supervisory officials." *Walker,* 917 F.2d at 1457 *citing Marchese,* 758 F.2d at 188 ("Here, the prison's internal affairs division investigated the stabbing and prepared an incident report, which defendant Dutton reviewed and discussed with the associate warden before signing and submitting it to the district attorney and the disciplinary board").[3]

The *Walker* Court also distinguished *Marchese* because the Court "imposed the broad investigative responsibilities outlines in *Marchese* upon the Sheriff in his official capacity." *Walker,* 917 F.2d at 1457 ("The Sheriff is sued here *in his official capacity and in that capacity,* he had a duty to both know and act." (Emphasis added)).

Finally, in 1998, the Sixth Circuit affirmed the dismissal of a claim of supervisory liability based on the "failure to investigate" stating:

> Young's claim against defendants McAninch and Goff is based solely on their alleged failure to investigate defendant Ward's behavior towards Young. Although Young stated that defendants McAninch and Goff had knowledge of his allegations against defendant Ward, this is insufficient to meet the standard that they either condoned, encouraged or knowingly acquiesced in the misconduct.

*Young v. Ward,* 149 F.3d 1185, 1998 WL 384564 *1 (6th Cir. Jun 18,1998).

Therefore, this Court concludes that Plaintiff cannot establish supervisory liability based on the allegation of the "failure to investigate." Furthermore, *assuming arguendo* that supervisory liability may be established in such a manner, Plaintiff has not set forth any evidence to support the alleged "failure to investigate." Plaintiff's conclusory allegations of misconduct are insufficient to withstand summary judgment on Count Six.

Consequently, Defendants' Motion for Summary Judgment Based on Qualified Immunity is **DENIED** with respect to Vaccaro, as genuine issues of material fact exist with regard to the essential elements of Counts One and Two, and **GRANTED** with respect to Count Six against Marhulik, Timko, and Thomas (Dkt.# 19).

**IT IS SO ORDERED.**

---

3. The criminal investigation in the above-captioned matter was controlled by the Ohio Bureau of Identification and Investigation. (Timko Aff. at ¶ 5). Upon completion of that investigation, the City of Warren conducted its own administrative review. (Timko Aff. at ¶ 7). The shooting review panel concluded that Vaccaro complied with department procedures, and a findings report, which was approximately 700 pages long, was forwarded to the Director of Public Service and Safety for the City of Warren for his review. (Timko Aff. at ¶ 8).